## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 7 |
| DAVID EDWARD PEROTTI and | * | |
| JUSTINE LEE PEROTTI, | * | |
| Debtors | * | |
| | * | |
| EDWARD PEROTTI, | * | CASE NO. 1-07-bk-01889MDF |
| Plaintiff | * | |
| | * | |
| vs. | * | ADV. NO. 1-07-ap-00144 |
| | * | |
| DAVID EDWARD PEROTTI and | * | |
| JUSTINE LEE PEROTTI, | * | |
| Defendants | * | |

## OPINION

### Introduction

Before me is the Complaint of Edward Perotti ("Plaintiff"), the father of Debtor David

Edward Perotti ("David"), seeking a determination that he retained a beneficial interest in his

home located at 5 Woodruff Avenue, Selinsgrove, Pennsylvania (the "Property") after he deeded

the real estate to his son. Plaintiff also requests the Court to find that two claims he filed in this

bankruptcy case are non-dischargeable.

The dispute over the Property centers on a deed that Plaintiff delivered to David in May

2006 conveying a fee simple absolute interest.  Plaintiff continued to reside on the Property after

delivering the deed with David's knowledge and acquiescence.  Immediately prior to filing the

instant bankruptcy petition, David sought to evict Plaintiff from the Property.  In the matter now

before me, Plaintiff seeks reconveyance of the Property, alleging that when he delivered the deed

to his son, he did not intend to convey a present beneficial interest in the premises.

Plaintiff has filed two proofs of claim in the case. The larger of the two claims (hereinafter "Claim #9" ) is based on Plaintiff's transfer of $41,825.00 to David and Justine Perotti (collectively "Debtors") in October 2006.  Debtors contend that this transfer was a gift, which Plaintiff denies. He asserts that Debtors fraudulently converted these funds to their own use without his knowledge or permission, thus rendering the debt nondischargeable under 11 U.S.C. § 523.  The dispute over the smaller claim (hereinafter "Claim #8") has its roots in a series of financial transactions in which Plaintiff and Debtors were involved beginning in 1996. Plaintiff contends that he has a claim against Debtors based on these transactions and that the claims are nondischargeable under 11 U.S.C. § 523.  Debtors argue that Claim #8 was discharged in the chapter 7 case that they filed in 2001.

**Findings of Fact**

*I. Regarding the Property*

Plaintiff and his late wife Christine Perotti (collectively "the Perottis") purchased the Property in 1975. Christine Perotti ("Christine") resided there until her death on December 5, 2003. [N.T. 7, 69]. Plaintiff continued to reside on the Property after his wife's death and was still living there when trial was held on the within matter. In addition to the Property, the Perottis also owned real estate in Middleburg, Pennsylvania. It was Christine's intention that David would acquire the Property and that David's sister ("Brenda") would be given the Middleburg real estate. Both Plaintiff and David stated that Christine Perotti urged her husband to transfer the two properties to their children before she died. [N.T.70, 210].

In March 2003, the Perottis took out a loan with Atlantic Pacific Mortgage Company ("APMC") secured by a mortgage on the Property. [P-17].  On the date of trial, the mortgage

2

against the Property was held by General Motors Acceptance Corporation ("GMAC"). [N.T. 100]. In May 2006, Plaintiff transferred the Property to David by deed dated April 20, 2006. [N.T. 76-77, 86]. The consideration offered by David in exchange for the transfer was "One ($1.00) Dollar and love and affection." [P-29]. David recorded the deed on July 21, 2006 in the Office for the Recorder of Deeds of Snyder County, Pennsylvania. [N.T. 88, P-29]. When he became concerned about his potential liability related to the Property, he contacted the insurance carrier, Erie Insurance Exchange ("Erie"), and informed an agent of the change in ownership. [N.T. 203]. Thereafter, Erie issued an amended declaration for the period December 4, 2006 through December 4, 2007. [P-59]. The declaration described Plaintiff as a "Lifetime Tenant." After the Property was conveyed to David, Plaintiff continued to reside there, providing routine maintenance and paying the taxes and insurance.

In January 2007, Debtors sent a letter to Plaintiff by certified mail that included a "Landlord's Demand and Notice." In the letter, Debtor directed Plaintiff to bar certain individuals from coming onto the Property and threatened to "terminate the arrangement" under which Plaintiff resided on the Property if he did not agree to the terms set forth in the letter.[1] [P-34, N.T. 100]. Plaintiff refused to agree to Debtors' demands, and Debtors then refused to pay the monthly mortgage payment to GMAC. [N.T. 100]. To avoid foreclosure, Plaintiff made the monthly mortgage payment, whereupon he discovered that Debtors had failed to forward funds to GMAC that Plaintiff asserts he provided to them to pay off his share of the mortgage. [N.T. 100].

---

[1]The letter mentions only Plaintiff's friend Barbara Arnold by name, but it purports to prohibit Plaintiff from inviting Ms. Arnold and/or any of her "friends or acquaintances" onto the Property. Based upon the testimony of both parties, the Court concludes that the discord that arose between Plaintiff and David stems from Plaintiff's relationship with Ms. Arnold.

3

In March 2007, Plaintiff sued Debtors in state court seeking to establish a constructive trust in his favor with respect to the Property. Plaintiff also sued either to recover the $41,825.00 he allegedly gave to Debtors to pay off his share of the mortgage or, in the alternative, to force Debtors to pay off the mortgage. [P-35] Plaintiff also filed a *lis pendens* against the Property. By letter dated March 30, 2007, Debtors gave Plaintiff notice to quit and remove himself and his possessions from the Property. At the time of trial, Plaintiff had not vacated the Property.

## II. *Regarding Claims #8 & #9*

Between 1996 and 2003, the Perottis took out loans with various lenders secured by mortgages against the Property.[2] The Perottis kept some of the proceeds of these loans for their own use and transferred other proceeds to Debtors with the understanding that Debtors would pay a pro-rata share of the monthly loan payments. These loans were repeatedly refinanced to obtain more favorable interest rates. As each new mortgage or refinancing occurred, Debtor Justine Perotti ("Justine"), who holds a bachelor's degree in finance, would recalculate Debtors' share of the monthly payment. [N.T. 92]. Debtors would then make regular payments in those amounts either to the Perottis or to the mortgage lenders directly.

### A. Claim #8

Through a series of six (6) transactions that occurred between January 30, 1996 and October 20, 1998, the Perottis took advantage of their personal credit rating to tap financial resources and procure funds to provide loans to Debtors. Debtors made periodic payments to the

---

[2] To the extent necessary, the details of these transactions will be discussed *infra.*

4

Perottis on these loans pursuant to written or oral agreements between the parties. A description of the six transactions follows.

On January 30, 1996, Plaintiff withdrew $1,000.00 from a Vanguard account that he held with his wife as tenants in common. [P-5]. Plaintiff then transferred these funds to Debtors as a loan. [N.T. 23].

On February 13, 1996, the Perottis borrowed $8,850.00 against a life insurance policy issued by AXA Equitable ("AXA"). [P-3, 4; N.T. 15 - 17]. The funds were loaned to Debtors to assist them in paying bills. Debtors agreed to repay the loan over ten (10) years at an interest rate of 6%. [P-4]. Between February 1996 and April 2003, Debtors paid only the interest that had accrued on the $8,850.00 loan. The AXA loan principal was paid in full on April 15, 2003 through the proceeds of the mortgage loan from APMC. [P-3].

On February 13, 1996, the Perottis borrowed $2,396.50 against an AXA life insurance policy and again transferred the proceeds to Debtors. [P-3, 4; N.T. 15 - 17]. Debtors agreed to repay the loan over ten (10) years at an interest rate of 6%. [P-4]. Between February 1996 and April 2003, Debtors paid only the interest that had accrued on the $2,396.50 loan. The principal of this loan also was paid in full on April 15, 2003 with the APMC mortgage proceeds. [P-3].

On February 20, 1996, Plaintiff withdrew another $4,000.00 from the above-referenced Vanguard account, which he then transferred to Debtors as a loan. [N.T. 23]. The terms of both loans were five (5) years at an interest rate of 11.5%. [P-6]. The record is unclear regarding the extent to which, if any, Debtors made payments on this loan.

On April 24, 1996, the Perottis obtained a loan from Mellon Bank in the amount of $67,000.00, secured by the Property. [P-7]. From this loan, $13,732.00 was used to pay off

5

David's truck, which Plaintiff expected David to repay. [N.T. 31]. Another $47,720.00 of the Mellon loan proceeds were used to pay off a prior mortgage loan from Swineford Bank. [N.T. 31-32]. Debtors' pro rata portion of the monthly mortgage payment was $671.00. [N.T. 32, 34]. Debtors paid the Perottis $671.00 or more per month on a regular basis for a certain period thereafter.[3] [N.T. 32, P-44].

On October 20, 1998, the Perottis refinanced the Mellon Bank loan through a secured loan from Swineford Bank in the amount of $72,920.73. [P-13]. Debtors' pro rata monthly payment on this loan was $285.00, which they paid for a certain period thereafter.[4] [N.T. 35, P-14, P-44].

In addition to these six (6) loan transactions, the Perottis also permitted Debtors to obtain goods from Lowe's by using their store credit card.[5]

On March 13, 2001, Debtors filed a bankruptcy petition under chapter 13. They did not list the loans from the Perottis as debts in their schedules and statements, and they did not inform the Perottis that they had filed. [N.T. 50, 139]. The case was converted to chapter 7 on August 20, 2002, and Debtors received a discharge on December 18, 2002.

On March 21, 2003, the Perottis refinanced the Swineford Bank loan through a secured loan from APMC in the amount of $89,158.67. [P-17]. The purpose of this refinancing was to

---

[3]Because, as I will discuss *infra*, any debt associated with this transaction was discharged in Debtor's prior bankruptcy case, the exact number or total amount of payments that Debtors made is not significant to the resolution of this matter.

[4]See footnote 3.

[5]Because, as I will discuss *infra*, any debt associated with Debtors' use of this credit card was discharged in Debtors' prior bankruptcy case, the exact amount of the Perottis' funds that Debtors effectively borrowed in using the card is not relevant.

6

obtain a lower interest rate than the existing Swineford Bank loan and to obtain additional cash for Debtors. In accord with this purpose, the Perottis transferred $2,372.17 of the loan proceeds to Debtors.[6] Debtors also agreed that they would repay the Perottis $1,524.00 of the closing costs for the loan. [P-20, P-21]. Therefore, in March 2003, Debtors entered into a new loan transaction with the Perottis and agreed to repay a total amount of $3,896.17.

**B. Claim #9**

After Plaintiff transferred the Property to David in May 2006, Plaintiff decided to refinance the mortgage so that he could pay off his share of the obligation. [N.T. 89]. He discussed his decision with David, who stated that he had been attempting to obtain new financing for Debtors' share on the loan balance, but had been unsuccessful. [N.T. 90]. Because he was unable to obtain refinancing, David asked Plaintiff to maintain the existing mortgage, and Plaintiff agreed to do so. [N.T. 90]. Plaintiff asked Debtors to calculate his share of the payoff amount because he was preparing to retire and wanted to pay off his share of the mortgage. Debtors informed him that as of August 25, 2006, his share of the $85,458.82 balance was $41,825.00. [P-31, N.T. 91-92].

In September and October 2006, Plaintiff cashed in various retirement accounts, which he planned to use to satisfy his share of the mortgage loan balance. [N.T. 93-94, P-32]. After the accounts were liquidated, he telephoned Debtors and informed them that he had funds sufficient to pay off his share of the loan. [N.T. 95]. During this conversation, David offered to come to

---

[6]The interest rate on the APMC loan was 5.375%. The interest rate on the Swineford Bank loan is not legible in P-13. At various times throughout the period between 1996 and 2003, both the Perottis and Justine monitored the mortgage market for better interest rates in order to reduce the monthly payment. [N.T. 54]

Plaintiff's home and pick up the funds Plaintiff had withdrawn from his retirement accounts, along with a withdrawal slip from Plaintiff's savings account (collectively "the Bank Drafts"). David represented that these funds would be deposited into Debtors' bank account and that Debtors, in turn, would issue a check to GMAC to pay off Plaintiff's share of the mortgage.[7] [P-32, N.T. 94-95, 190]. Plaintiff expected that Debtors would continue to make the mortgage payments, although the mortgage would remain in his name to allow Debtors to keep the advantageous interest rate. Although Debtors did deposit the $41,825.00 into their bank account, they failed to remit the monies to GMAC. Rather, Debtors used the funds to pay off two other loans Debtors owed to third parties. [N.T. 98, P-33].

### Procedural History

Debtors filed the instant chapter 13 case on June 21, 2007. The case was converted to chapter 7 on November 8, 2007.[8]

Plaintiff filed the instant adversary case on October 9, 2007 in which he requests the Court to find that a debt to him in the amount of $41,825.00 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2) and/or (4). He also requests that a debt of $39,960.38 be declared to be nondischargeable under § 523(a)(2) and/or (4). With regard to the Property, Plaintiff advances several alternative forms of relief. He first requests the Court to "rescind or revoke the deed." He

---

[7]The Bank Drafts were admitted into evidence as Plaintiff's Exhibit 32. The transcript of the trial incorrectly reports the amounts listed in the exhibits. However, the electronic sound recording demonstrates that the same figures that appear on P-32 were verbally placed on the record by the Court.

[8]Debtors' 2001 case precludes them from receiving a chapter 7 discharge through the instant case. 11 U.S.C. § 727(a)(8) (court shall grant debtors a discharge unless they have received a chapter 7 discharge "in a case commenced within the eight (8) years before the date of the filing of the petition").

8

also seeks an order preliminarily and permanently enjoining Debtors from attempting to evict him from the Property and from transferring or encumbering the Property. Plaintiff also seeks an order compelling Debtors and the chapter 7 trustee to reconvey the Property to Plaintiff. In the alternative, Plaintiff asks this Court to declare that a resulting or constructive trust arises in favor of Plaintiff under which David holds bare legal title to the property while Plaintiff continues to enjoy the beneficial interest. As a further alternative, Plaintiff asks this Court to reform the deed to provide for a life estate for Plaintiff in the Property and to grant to Plaintiff a security interest against the Property for any debts that may be found to be nondischargeable in this proceeding.

A hearing has been held and briefs have been filed. The matter is ready for decision.[9]

## Discussion

As indicated above, Plaintiff asserts numerous, alternative theories for obtaining relief regarding the Property. I will address each of those theories separately below.

### I. *Revocation, Rescission or Reformation of the Deed*

In bankruptcy, property rights are determined according to the law of the state in which the property is situated. *Butner v. United States*, 440 U.S. 48 (1979). Thus, the law of Pennsylvania determines whether the deed transferring the Property to David may be revoked, rescinded, or reformed.

"A rescission amounts to the unmaking of a contract, and is not merely a termination of the rights and obligations of the parties towards each other, but is an abrogation of all rights and responsibilities of the parties towards each other from the inception of the contract. It is a form of

---

[9]This Court has jurisdiction pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A), (I) and (O). This Opinion constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure 7052.

9

retroactive relief." *Metropolitan Property and Liability Ins. Co. v. Commonwealth,* 97
Pa.Cmwlth. 219, 223, 509 A.2d 1346, 1348 (1986). "Rescission . . . put[s] the parties in the
position they were in before the contract was executed. [I]t invalidates the contract from the
beginning." *Bemer Aviation, Inc. v. Hughes Helicopter, Inc.*, 621 F.Supp. 290, 294 (E.D. Pa.
1985) (citing *Gilmore v. Northeast Dodge Co., Inc.,* 278 Pa.Super. 209, 420 A.2d 504 (1980)).
Revocation has a similar meaning – "to recall, to take back, to repeal." *In re Bingaman's Estate*,
281 Pa. 497, 502, 127 A. 73, 75 (1924). *See also U.S. v. Malesic*, 18 F.3d 205, 206 (3d Cir.
1994)("'Revoke' generally means to cancel or rescind."). Accordingly, as I examine whether
under Pennsylvania law Plaintiff may "rescind" or "revoke the deed," I will consider these terms
to be synonymous.

Under Pennsylvania law, "the formal act of signing, sealing and delivering is the
consummation of the deed, and it lies with the grantor to prove clearly that appearances are not
consistent with truth." *Loughran v. Kummer*, 297 Pa. 179, 182, 146 A. 534, 535 (1929). In the
absence of "clear, precise, convincing and satisfactory evidence" that the delivery of a deed was
conditional, title passes when the deed is delivered to the grantee. *Id.* In *Loughran*, a grantor
sought to revoke a deed on the grounds that the parties' intent was that the deed was not to be
recorded until after the grantor's death, but that the grantee recorded the deed during the
grantor's lifetime. The Court held that the deed could not be revoked because the grantor
admitted that the deed did not include the oral condition that it was not to be recorded before the
grantor's death. Similarly, in the instant case, Plaintiff testified that he deeded the Property to
David to honor Christine's wishes. Delivery of the deed was the consummation of that intent.
Plaintiff believed that the Property was still his home, and he believed that his son shared that

10

belief, but he specifically rejected the recommendation of the attorney who drafted the deed that he explicitly provide for the reservation of a life estate.

Fraud, mistake, or duress may provide grounds for rescission of a transfer of real property. *See In re Yasipour*, 238 B.R. 289, 291 (Bankr. M.D. Pa. 1999) (citing Restatement (Second) of Trusts § 38 (1959)). See also *Frank v. Allegheny County*, 119 F.2d 614, 617 (3d Cir. 1941) (citing Restatement of Restitution § 107(1)). Plaintiff does not allege fraud or duress, but in his Pre-trial Brief, he avers that he should be permitted to revoke or rescind the deed based on one or more of the following "mistakes":

1.  Plaintiff was mistaken that the transfer of the deed to his son would not affect the existing mortgage, and that a provision requiring immediate payment of the entire loan in full upon the occurrence of a transfer of ownership would not be triggered by such a transfer.
2.  Plaintiff was mistaken that Debtors were trustworthy.
3.  Plaintiff was mistaken as to Debtors' intent to allow him to remain on the Property as a life tenant.

(Pre-trial Brief, pp. 24-25). None of these mistakes justify revocation of the deed. Plaintiff's failure to understand that transfer of the Property to his son would accelerate the mortgage does not justify revocation of deed. Plaintiff failed to establish that the transfer was conditioned upon waiver of the acceleration clause or even that the mortgage company was attempting to enforce the clause. Plaintiff's mistaken impression that Debtors intended to allow him to remain on the Property is equally unavailing. For the reasons set forth later in this Opinion, the Court believes that at the time the transfer of legal title occurred, Debtors did intend to allow Plaintiff to remain in his home. It was subsequent events that caused them to change their minds. However, events that occur after a transfer are irrelevant to ascertaining a party's intent at the time of the transfer. Likewise, Plaintiff's assertion that he was mistaken about

11

Debtors' trustworthiness also does not establish a basis for revocation of the deed. While it is abundantly clear that Debtors were not trustworthy, the breach of trust occurred after the deed was delivered.

Accordingly, Plaintiff has failed to make out a claim for revocation. This is the law even though the Property was transferred as a gift. An *inter vivos* gift of real property must meet two criteria in order to be valid. The grantor must possess a donative intent and a deed must be delivered that transfers dominion over the real property to the donee. *Fiore v. Fiore*, 405 Pa. 303, 305-06, 174 A.2d 858, 859 (1961); *Mericle v. Wolf*, 386 Pa. Super. 82, 85, 386 A.2d 364, 366 (1989). Plaintiff delivered a deed to David, which stated that the consideration for the transfer was "[o]ne dollar ($1.00) and love and affection." Accordingly, both a donative intent and delivery are present. Once the making of a gift has been completed, a grantor may not revoke a gift in the absence of fraud, accident, or mistake. *In re Estate of Keeney*, 465 Pa 45, 52, 348 A.2d 108, 112 (1975).

Similar legal impediments exist to Plaintiff's request for reformation of the deed. Reformation of a deed requires clear, precise, and convincing evidence that the grantor's mistake existed at the time of the transfer. *Masgai v. Masgai,* 460 Pa. 453, 333 A.2d 861 (1975), *La Rocca Trust,* 411 Pa. 633, 192 A.2d 409 (1963) *(cited in Berger v. U.S.*, 487 F. Supp. 49, 51 (W.D. Pa. 1980)). Plaintiff testified that his attorney recommended that he reserve a life estate in the deed, but that he declined to do so. He opted not to specify the reservation of a life estate as a demonstration of the trust he reposed in his son. Also, he relied on his experience with his own father, who had lived in a home that was owned by Plaintiff. Plaintiff did not interfere with his

12

father's occupancy of the Middleburg home during his father's lifetime, and he assumed that his son would exercise the same deference.

In the complaint, Plaintiff acknowledges that his trust was misplaced and asserts that "at the time Plaintiff made the gift of the Deed to his son, he mistakenly believed and understood that Debtors agreed, recognized and accepted that Plaintiff reserved a life tenancy . . . ." [Complaint, ¶¶ 87(c), 90 - 92].  I disagree. Debtors did recognize that Plaintiff was reserving a life tenancy, they simply changed their minds and decided to enforce the literal terms of the conveyance. But even if Plaintiff were correct about Debtors intentions at the time of the transfer, reformation of the deed would be justified only if Plaintiff had conveyed a greater estate than he had intended to convey. Actual intent is the key. *See Yohe v. Yohe,* 466 Pa. 405, 415-16, 353 A.2d 417, 422-23 (1976). Plaintiff intended to convey a fee absolute interest to David. Reservation of a life estate was unnecessary because he was certain his son would not interfere with his possession of the Property during his lifetime. If Plaintiff had instructed the scrivener to explicitly provide for a life estate and the provision had been omitted, reformation of the deed would be appropriate. Here, the language of the deed conforms to the intent of the grantor, thus barring reformation of the instrument.

## II.  Resulting Trust

In his Reply Brief, Plaintiff argues that at the time he conveyed the deed, he intended to reserve all beneficial interests in the Property during his lifetime. Therefore, Plaintiff argues, David "holds title under a resulting trust subject to Plaintiff's beneficial interest." (Plaintiff's Reply Brief, p. 8).

13

The concept of a resulting trust is best explained in contrast to an express trust. An express trust is created if the settlor "manifests an intention to create it, although the manifestation may be made by conduct as well as by words." *Gray v. Leibert,* 357 Pa. 130, 135, 53 A.2d 132, 134 - 35 (1947).

> A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest in the property. In other words, an express trust is created if it appears that there was an affirmative intention to create it; whereas in the case of a resulting trust the circumstances indicate the absence of an intention to give the beneficial interest to the person in whom the legal title to the property is vested.

*Id. quoting* Scott on Trusts, Vol. 3, § 404.1, p. 2163. *See also Godzieba v. Godzieba*, 393 Pa. 544, 143 A.2d 344 (1958).[10] In Pennsylvania "the trustee owns the legal title to, but not the beneficial interest in, the trust property." *In re Fulton*, 240 B.R. 854, 863 (Bankr. W.D. Pa. 1999). "[A] resulting trust can be established only by clear, explicit and unequivocal evidence." *Zahorsky v. Leschinsky*, 394 Pa. 368, 372, 147 A.2d 362, 365 (1959). Thus, in the instant case, the issue is whether the circumstances under which Plaintiff conveyed the Property to David clearly, explicitly, and unequivocally indicate that Plaintiff did not intend to give "the beneficial interest" in the Property to his son.

---

[10]Pennsylvania law expressly excludes both resulting trusts and constructive trusts from the purview of the statute of frauds. The Act of April 22, 1856, P.L. 532, § §2. 4, 33 P.S. § 2 provides that "[a]ll declarations or creations of trusts . . . of any lands, tenements or hereditaments . . . shall be manifested by a writing. . . . Provided, That (sic) where any conveyance shall be made of any lands or tenements by which a trust . . . shall or may arise or result by implication or construction of law . . . , then and in every such case such trust ... shall be of the like force and effect as if this act had not been passed. Act of April 22, 1856, P.L. 532, § §2. 4, 33 P.S. § 2. *See also Godzieba*, 393 Pa. at 549, 143 A.2d at 347 ("Resulting trusts are expressly exempted from the operation of ... the statute which requires that all trusts of land be manifested by a writing."); *Silver v. Silver*, 421 Pa. 533, 536, 219 A.2d 659, 661 (1966) (a constructive trust is expressly excluded from the statute of frauds).

14

In *In re Stewart*, 368 B.R. 445 (Bankr. E.D. Pa. 2007), *aff'd*, 2008 WL 938920 (E.D. Pa. April 4, 2008), Judge Frank confronted issues similar to those present in the within case. In *Stewart,* approximately two years before the debtor filed his petition, the debtor's mother transferred to the debtor and his sister the deed to the property in which she resided. The deed that effectuated the transfer did not include the reservation of a life estate. The debtor's mother, who had lived in the residence for 51 years, continued to live at the property after the transfer, pay real estate taxes and provide for maintenance. As set forth in the deed, consideration for the transaction was one dollar.

When the chapter 7 trustee moved to sell the property, the debtor objected, arguing that he held only bare legal title to the property in a resulting trust in favor of his mother. In response, the trustee argued that the language of the deed was clear and did not admit of testimony regarding the parties' intent. Judge Frank examined Pennsylvania law regarding resulting trusts, disagreed with the trustee's argument, and ruled in favor of the debtor.[11] The court noted that it "should declare the existence of a resulting trust only when it is firmly convinced by the evidence that the transferor did not intend to transfer the beneficial interest in the property at issue." *Id.* at 452. After considering the testimony and circumstantial evidence offered, the court concluded that the debtor's mother intended to retain the beneficial interest in the property for herself and did not intend to convey it to her son and daughter. Here, the evidence is compellingly similar to that presented in *Stewart*.

---

[11]The Court recognized that parol evidence is admissible in Pennsylvania to establish a resulting trust. *Stewart*, 368 B.R. at 452 (citations omitted.) *See also* footnote 12, above.

Case 1:07-ap-00144-MDF    Doc 36    Filed 08/27/08    Entered 08/28/08 14:05:39    Desc
Main Document    Page 15 of 22

After being encouraged by David to abide by his deceased wife's wishes, Plaintiff conveyed his home to his son. Following the transfer, David did not take possession of the Property. Plaintiff continued to reside there and to enjoy all of the benefits and to perform all the responsibilities of ownership. He continued to pay the taxes and insurance on the Property and otherwise generally maintained it.[12] Debtors do not dispute that it was understood that after David accepted the deed Plaintiff would continue to live on the Property. They also do not dispute that Plaintiff was not required to pay rent for his use of the premises. All of these factors contribute to the conclusion that Plaintiff would maintain the beneficial interest in the Property and that the deed merely transferred bare legal title. This intention is further illustrated through the amended declaration to the insurance policy that was issued at David's request, which listed Plaintiff as an insured "life tenant" and David as an additional insured.[13]

Plaintiff conveyed the deed at or around the same time that he was preparing to retire.[14] At about the same time he also liquidated his retirement accounts so that he could pay off his share of the mortgage on the Property. Debtors argue that Plaintiff: (1) conveyed the Property to David without intending to retain the beneficial interest; (2) liquidated all of his retirement savings and gifted them to Debtors; and (3) retired. To accept this argument, I must assume that

_____

[12]Plaintiff testified that when the Borough of Selinsgrove sent out a notice that required improvements to be made to the curbing at the Property, Plaintiff paid for the improvements.

[13]David disputes that he instructed the insurance agent to indicate that his father held a life estate and asserts that he told the agent that the property had been transferred to him but that his father continued to reside there. However, no evidence was introduced that David took steps to change the information on the declaration or remove his father as a loss payee.

[14]The testimony indicated that Plaintiff retired on a date between May and October, 2006. [N.T. 189 - 90].

Plaintiff intended to divest himself of substantially all of his assets, while at the same time eliminating his primary means of support. As recited herein, there is clear, precise, and convincing evidence that this was not his intent. It is clear that Plaintiff wanted to honor his deceased wife's wishes and ensure that his son would receive the Property upon Plaintiff's death. But I find that he also intended to retain the enjoyment of his home during his lifetime.

For these reasons, I conclude that it is appropriate to order the imposition of a resulting trust in which David holds the Property as trustee and that Plaintiff is the beneficiary of the trust for his lifetime.

### III. Constructive Trust

In his post-trial brief, Plaintiff asserts that David "holds bare legal title as constructive trustee and is under a duty to reconvey legal title to Plaintiff because of fraud, mistake, the abuse of a confidential relationship and to prevent unjust enrichment." (Plaintiff's post-trial brief, p. 16). As this statement indicates, Plaintiff asserts a number of theories of law as to why a constructive trust should be imposed. Because I have determined that the acts of the parties demonstrated an intent that a trust would arise with the transfer of the deed, it is unnecessary for me to determine whether I should impose a constructive trust on the Property based upon claims of unjust enrichment. Therefore, having found that David holds the Property in resulting trust for his father, I decline to impose a constructive trust.

### IV. Dischargeability of Plaintiff's Claims

#### A. Claim #8

Plaintiff's general, unsecured claim in the amount of $37,915.12 is attributable to loans

that the Perottis made to Debtors dating to 1996.[15]  The precise basis for this amount is not

clearly spelled out in the pleadings, and the testimony in support of the amount was inadequate

and unclear.  Generally, however, the evidence showed that as of April 2003, Debtors admitted to

owing the Perottis a total of $49,540.00 based on these loans and that they were to pay $409.40

per month on the balance. (P-20). Debtors do not dispute the amount they borrowed from the

Perottis, but they do dispute whether Plaintiff has a viable claim for the full amount.  Debtors

argue that any general, unsecured claim that Plaintiff held based on transactions pre-dating their

2001 bankruptcy petition was discharged even though Plaintiff was not listed as a creditor

therein.  Debtors rely on the Third Circuit's decision in *Judd v. Wolfe,* 78 F.3d 110 (3d Cir. 1996)

to support their argument.

In *Judd*, the Circuit Court interpreted the language of 11 U.S.C. § 523(a)(3)(A), which

excepts from discharge debts that were "neither listed nor scheduled . . . in time to permit . . .

timely filing of a proof of claim. . . ."  11 U.S.C. § 523(a)(3)(A).  Ruling on an appeal from the

bankruptcy court's order denying the debtor's motion to reopen her case to add an unscheduled

creditor, the Circuit Court held that the order was appropriate because there were no assets that

could be liquidated to provide a distribution to creditors.  Therefore, in the absence of assets for

distribution, no bar date for filing proofs of claim was set.[16]  The Court held that "in a no-asset,

---

[15]As indicated in the factual findings, the Perottis obtained loans from various sources
that they in turn loaned to Debtors.  The sources of the funds were life insurance policies owned
by the Perottis, mortgages taken out by the Perottis against their residence, and the use by
Debtors of the Perottis' credit cards.  For purposes of the instant decision, it is not necessary to
trace the precise source of these loans.

[16]However, the Circuit Court recognized that reopening the case to add the creditor might
be useful to the debtor, in that her schedules would more accurately reflect the actual extent of
her discharge and thereby enhance her creditworthiness.  *Id.* 78 F.3d at 117.  Based on this
reasoning, the Circuit Court remanded the case to the bankruptcy court for a determination
regarding whether or not reopening the debtor's case to add creditor Wolfe to the list of creditors

18

no-bar date case, dischargeability is unaffected by scheduling. After a case is closed, the debt in question was either discharged or excepted from discharge based on sections 523 and 727(b)." *Judd*, 78 F.3d at 111. In other words, "in a no-asset Chapter 7 case, the exception to discharge for unlisted debts is inapplicable." *In re Close*, 2003 WL 22697825, *5, fn. 8 (Bankr. E.D. Pa.). Under *Judd*, whether or not the unlisted creditor had actual notice of the filing of the petition is "irrelevant." *In re Beck*, 272 B.R. 112, 121, fn. 13 (Bankr. E.D. Pa. 2002).

Plaintiff argues, however, that *Judd* is inapplicable to Claim #8 because Debtors continued to make voluntary payments on a regular basis even after they received a discharge in the 2001 case. While the record shows that Plaintiff's position is factually accurate, and Debtors did make numerous payments post-discharge, such payments did not create a new obligation to pay that survived the 2001 discharge. Section 524(f) provides, essentially, that the Bankruptcy Code does not prohibit a debtor from voluntarily repaying a debt that has been discharged in bankruptcy. "While the Bankruptcy Code preserves a debtor's right to voluntarily pay a discharged debt . . . it is clear that the discharge and its injunction stand as a firm barrier against any party who attempts to coerce payment from the debtor. Having determined that the Loan was discharged by the Discharge Order, § 524 gives that order the effect of an injunction against forced collection as a matter of law." *Close*, 2003 WL 22697825 at *6. A debtor's voluntary post-discharge payment on a discharged debt does not revive the debt, nor does it empower the claimant to enforce the claim in a subsequent bankruptcy case. Accordingly, I conclude that the debt represented by Claim #8 was discharged in Debtors' prior bankruptcy to the extent that it represents loans extended to Debtor prior to March 13, 2001.

---

would have the effect of promoting her "fresh start." *Id.*

The evidence shows that in March 2003, Plaintiff and Debtors agreed to restructure the debt Debtors owed to the Perottis and to advance additional funds. The Perottis obtained a new mortgage from which they loaned Debtors $2,372.17. Closing costs were also incurred to complete the transaction and, as Plaintiff credibly testified, Debtors agreed to pay a portion of those costs. Plaintiff showed that Debtors included their share of these costs in their calculation that they were to pay $410.00 per month toward the mortgage. Accordingly, the additional funds transferred to Debtors in March 2003 ($2,372.17) and Debtors' share of the closing costs ($1,524.00) in a total amount of $3,896.17 were not discharged in the 2001 bankruptcy.

### B. Claim # 9

Plaintiff alleges that in 2006 he gave Debtors $41,825.00 to apply to his share of the GMAC loan. Debtors allege that these same funds were a gift. If Debtors were currently eligible for a discharge, I first would have to determine whether the Bank Drafts admittedly deposited by Debtors in their bank account were a gift or were funds misappropriated by Debtors for their own use. If I found that there was no gift, I then would have to decide whether the debt is non-dischargeable under § 523(a)(2)(A) or 523(a)(4).

In this case, however, Debtors are not eligible for a discharge because they were granted a discharge in a chapter 7 case filed within eight years of the date of the petition in the current case. *See* 11 U.S.C. § 727(a)(8). At this time, the question of whether these debts should be excepted from discharge under § 523(a)(2) or §523(a)(4) is not ripe. "A determination of dischargeability of a debt is meaningful only in the context of a discharge. If a case is dismissed prior to the entry of discharge or the discharge is denied or revoked, a judgment as to dischargeability of a debt becomes moot unless a subsequent bankruptcy is filed." *In re Chilton* 2004 WL 3510108, *1

20

(M.D.N.C.) *citing In re Thrall*, 196 B.R. 959, 968 (Bankr.D.Colo.1996), *In re Unruh*, 278 B.R. 796, 806- 07 (Bankr.D.Minn.2002); *In re Lindley*, 121 B.R. 81, 90-91 (Bankr.N.D.Okla.1990). "Federal courts may adjudicate only actual, ongoing cases or controversies. . . . If a case is indeed moot, the Court must refrain from reaching the merits because any opinion issued would be merely 'advisory' and rest on hypothetical underpinnings." *In re Unruh*, 278 B.R. 796, 807 (Bankr. D. Minn. 2002), *citing Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477-78 (1990) (other citations and internal quotations omitted). Thus in *Unruh*, the Court refused to adjudicate a complaint for nondischargeability under § 523(a)(14) because it had previously determined that the debtor should be denied a discharge under §727(a)(4)(A). Similarly, because §727(a)(8) precludes a discharge in the instant case, a decision on dischargeability would be merely advisory and therefore improper.

The Court must decide, however, whether the funds were a gift to Debtors or whether Plaintiff intended that they be used to satisfy his share of the mortgage on the Property and, thus, are now a claim against Debtors' estate. I find credible Plaintiff's testimony that he gave the Bank Drafts to Debtors based on David's representation to him that they would deposit the funds into Debtors' checking account and then send check to GMAC in the same amount. I find this testimony to be credible for several reasons. First, it comports with Plaintiff's testimony, which Debtors did not dispute, that Plaintiff desired to pay off his share of the mortgage before he retired. Second, Debtors did not dispute that Plaintiff's share of the mortgage was $41,825.00, which also was the exact total of the Bank Drafts that Plaintiff turned over to Debtors. Debtors' assertion that Plaintiff gifted to them an amount exactly equal to his share of the mortgage is

21

simply too convenient to be believed. Thus, the Bank Drafts were not a gift, and Plaintiff has a claim against Debtors in the amount of $41,825.00.

## Conclusion

I find that it was Plaintiff's intention that David would obtain legal title to the Property subject to Plaintiff's life estate at the time of the transfer of the Property. Therefore, David holds the Property in a resulting trust. The chapter 7 trustee may sell David's remainder interest in the property, but may not disturb Plaintiff's life estate.

Further I find that Plaintiff has a claim against Debtors in the amount of $45, 721.17, consisting of the portion of Claim #8 that arose after the prior bankruptcy ($3,896.17) and Claim #9. Further, because Debtors are not seeking a discharge in the within case, issues of dischargeability raised in Plaintiff's complaint are not justiciable.

An appropriate Order will follow.

By the Court,

Bankruptcy Judge

Date: August 27, 2008

*This document is electronically signed and filed on the same date.*

Case 1:07-ap-00144-MDF   Doc 36   Filed 08/27/08   Entered 08/28/08 14:05:39   Desc
Main Document     Page 22 of 22